The next case is AliveCor, Inc. v. ITC, No. 23-1509. Mr. Pack, let them settle. You can approach the podium. All right, just a housekeeping issue. I would like to actually adjust my time allocation so that for the 499 issues, I'd like to reserve five minutes for the ITC, the issues for which we have the appeal, and then reserve 10 minutes of my time to deal with the arguments from the panel. I don't understand. I thought you all had 15 minutes. Yes, Your Honor. So I'm just dividing up the time, so when I go to talk about the issues that AliveCor is appealing, I would like to use five minutes, or about 15 minutes, and then reserve 10 minutes to deal with Apple's arguments. Or I could... He wants to save 10 minutes for a rebuttal? Yes, Your Honor. Oh, you just want to talk for five minutes. That's right, Your Honor. I thought we were reserving two different... Better put, Your Honor. Okay, so while you're clocked... Okay, he's going to do five first, so it's going to turn yellow very, very quickly. Five and 10, not 10 and five. Right, five and 10 instead of 10 and five. Well, just watch the clock, because we have a lot of argument in this case, and we're going to keep to time. Thank you. When you're ready. May I please report, Your Honor, with respect to the issues that AliveCor is appealing on the ITC, our position is that we believe the Commission correctly found most issues to be accurately found based on the law. The two issues that I want to raise for Your Honor's consideration or argument relate to the 499 patent. The first is the finding with respect to patent eligibility of the claims of the 499 patent, and the second will be dealing with the infringement issues around the alerts limitation. So on the first issue, Your Honor, I think it's important to understand that we have agreement between Apple and AliveCor on what the state of the art was in terms of what is the problem being solved. And the problem being solved is predicated on the medical science around arrhythmia. Arrhythmia is an episodic disease. So episodes come and go, and it comes and goes according to irregular patterns. It's very difficult to detect. It's also progressive, which means that as the disease progresses over time, the treatment options become smaller and the success rates become lower as well. So the inventive solution developed by AliveCor solves this problem through a technological improvement by combining a variety of sensors that are recited in the claims of the 499 claims that include on a smartwatch, and we're dealing with Claim 16 that recites a smartwatch. In a smartwatch form factor, you have a heart rate sensor, an ECG sensor, and an activity sensor. So we're dealing with a unique combination of hardware elements on a smartwatch form factor. One thing important to note, Your Honor, because it may have been glossed over in Apple's presentation of the issues, it's very different to deal with a single lead ECG measurement data than a conventional 12 lead, where you have much more electrical information about the heart. And as the evidence showed in the ITC record, it took Apple many, many years to be able to integrate a single lead ECG that could be reliably performing in a smartwatch form factor. But it's not just the hardware integration, Your Honor. It's also the software that is needed to process a single lead ECG data in order to confirm the presence of arrhythmia at a level that would qualify, for example, for FDA approval. It was a very difficult problem to solve, as evidenced by the secondary considerations evidence in this case. This embedded solution here uses this unique combination of hardware combined with software algorithms, including machine learning algorithms that are recited in Claim 17, to do two things. One is to detect arrhythmia using PPG data that everybody agrees has incomplete information about the electrical signals that are running through the heart. Because it's an optical signal that only tells you. You're almost done with your time on the 499. Let me ask you about the infringement contention on the alert. Is it your contention that the administrative law judge effectively construed alert broadly enough to cover all calls to action? And if so, where did that happen? Yes, Your Honor. So that happened, it is Markman Order that he issued. And the page? Let me find the page for you, Your Honor. So I believe that page is... I guess you can give it to me. Yes. But you need that broad of a construction, isn't that correct? We do need that broad construction. We believe that the judge actually used the broad construction in his claim construction aspects of his initial determination as well. The issue is... Yeah, I understand it. Let me just get you to where my concern is. I tend to think you have substantial evidence, probably at least for a DOE theory, but that's not what our issue is. Our issue is, how is there not substantial evidence for a finding of non-infringement? Help me understand how I could possibly find that. Yes, so with respect to non-infringement, you have literal, we argue both literal and DOE. And on the substantial question issue, what Your Honor will find is that in the Apple's own documents that they were telling the users, there's an important excerpt that is left out of the ALJ's findings. In the website, telling the users how to use the Apple Watch, it says, one of the situations in which you are to take an ECG measurement on the device is when you receive the irregular rhythm notification. That is an instruction, which under the Tennis Case Law is evidence of how an alert, in this case, is to be used by Apple itself. So setting aside all the third party documents, this is Apple's own document teaching users how to perform that act. And I think that was an important part of the ALJ's analysis that was left out. Thank you. Thank you. And Your Honor, I'll get you the site. Ms. Bosworth. May it please the Court, I'd like to very briefly address some inaccurate statements in the discussion of the 499 patent before I proceed to ask questions. Can I ask you a threshold question? We have the PTAB case coming up next. Yes, Your Honor. What's the effect of that case if we affirm there on this case? If you affirm in the PTAB appeal, then AliveCorps no longer has a valid patent on which it could pursue a Section 337 complaint. The right posture, as this Court has said, for example, in the TransOva case from 2018, is to vacate the ITC's ruling, that is the final decision, as well as the remedial orders, and remand to the agency with instructions that the complaint be dismissed and the investigation be terminated. Turning back to the 499, just on 101, the claims of the 499 patent do not contain most of what AliveCorps Counsel talked about. They specify only that the ECG sensor is on the mobile computing device, which for Claim 16 is a smartwatch. They do not specify where or what kind of heart rate or activity sensor is involved in the system. They also do not use the words confirm or detect, nor do they describe that process. They are much broader. The argument about the single-lead ECG, that is not a requirement of these claims. That's also an argument that AliveCorps waived if the Commission agrees, and its evidence does not support that in any event. The claim simply refers to a smartwatch. Claim 16 refers to the mobile computing device as being a smartwatch, correct, Your Honor? And as to the infringement issue, I want to correct a few things. The ALJ did not find that the claim was as broad as AliveCorps Counsel said. The site is Appendix 323. The only issue at Markman that was resolved here was whether the alert has to be a literal message. The ALJ said it doesn't. It does not exclude a non-linguistic method of alerting, but the question for infringement purposes is what is the content of that alert? Reference to the statements on Apple's website are both irrelevant. This is about what happens on the watch. It's not, for example, an inducement case. They're also wrong, nor does Apple state you are to take an ECG when you get an IRN alert. What it says is you can take an ECG at any time, including when you receive an IRN alert. I'd like to turn with the Court's permission to the two fundamental flaws in the Commission's decision that Apple contends require a reversal as to all three asserted patents. First, the legal error in finding the domestic industry requirement met based on expenses that do not pertain to the only domestic industry product that's the card revamped, and second, the legal error in rejecting Apple's strong prima facie obviousness showing on separate prior art from the art on which the PTAB relied to invalidate these same patents based on evidence of secondary considerations that even the ALJ acknowledged was not particularly strong. Starting with domestic industry, the Commission itself recognized a fundamental flaw in the ALJ's analysis. At Appendix 12, Note 16, it clarified that the requirement that investments be with respect to the articles protected by the patent applies with respect to subsections A, B, and C. The Commission, however, failed to appreciate the consequences of that error in the ALJ's analysis. Namely, as the ALJ had correctly recognized under subparagraphs A and B, any expenditures on the prototype products rather than the domestic industry article, the Cardia Band, should have been excluded. That's at Appendix 264 to 265. Yet the ALJ included those same expenses under subparagraph C with no explanation, apparently overlooking the fact that the article's requirement applies to all three subparagraphs as the Commission clarified and as this Court has held. The Commission did not offer an explanation for how it was nonetheless counting those expenditures in the prototype products as somehow supporting an existing domestic industry in the discontinued- Wasn't there some finding about sort of residual benefits to the users of the now discontinued product? There was a mention of some purported benefit. There's two problems with that, Your Honor. One is a legal problem. There's no authority for finding an existing domestic industry- Have you ever said you can't do that? I don't believe the Court has ever confronted this kind of situation, but if you think about it, right, we're talking about an existing domestic industry, and there's also a way to show a domestic industry that is being established, which a Live Corps tried to do through these prototype products, and the Commission rejected that. It said a Live Corps hadn't shown that it had a significant likelihood of actually developing an industry in those products, yet somehow it said the same spending that it wasn't willing to rely on on its own merit counted because it somehow benefited Cardioband users. We don't think there's any legal authority for that. Certainly it's not in the Hyosung case, for example, that the Commission relies on, where you had a product that was still being deployed, and so- You said there's a second problem. Yes, Your Honor, I'll get to the evidentiary problem. The second problem is that there's simply no support for such a finding in the record. A Live Corps and the Commission talk on appeal about software updates. That's not in the Commission's analysis. Again, all the Commission said on this product's requirement was that it benefits Cardioband users. It didn't explain how, and I'd note that in particular, a Live Corps did try to rely on spending on software development. The ALJ rejected that evidence. This is at Appendix 271. It rejected that evidence as unreliable. Economic domestic industry, there's also a separate problem with the lack of nexus to the patents, as well as a lack of showing of significance, but I'm mindful of the time, and with the Court's permission, I'd turn to the obviousness issue. So- Could you tell us, what is our standard of review of the balancing of the secondary considerations evidence against the strength, the prima facie case? Do we do that balance de novo? I believe so, Your Honor. Yes, the finding as to any given secondary consideration topic, copying or praise would be for substantial evidence, but the weighing of the gram factors is a question of law, and so that's why here, too, we think there's a legal error, as well. So if the Commission said, copying evidence is strong, for example, we have to review that for substantial evidence, but then the weighing of that strong secondary evidence of non-obviousness against a strong prima facie case, that's for us to do de novo. That's correct. I want to clarify here, the Commission did not say that the evidence of copying was strong. It did not say, the Commission did not say that the overall evidence of secondary considerations was strong. The ALJ, at one point, characterized it that way, but that included the commercial success evidence, which the Commission rightly rejected as weak. Even as to the copying and the industry praise, although there is that stray characterization of it as strong, elsewhere, the ALJ describes the evidence of alleged copying as not exactly a smoking gun and circumstantial evidence of copying and admits that the industry praise evidence is not unqualified and also not totally directed to the actual patented technology. So again, the first error here is the legal one in allowing tepid evidence of secondary considerations at best to overcome an undeniably strong prima facie case of obviousness. This court said, for example, in Wires that secondary considerations should never overcome a strong prima facie showing, and it has done so only once in the Transocean case. The court recognized that that was an outlier case and you had seven different categories of secondary considerations. Jury findings on each specific one that this court determined were supported by substantial evidence. That's certainly not this case, but even if the court were to look at this from a substantial evidence perspective, there is no evidence of, certainly not of copying and no evidence of praise with nexus to the patented technology. Here too, Alive Chrome and the Commission on Appeal make an argument that's very different from what the ALJ actually said. They focus on things like whether Apple had access to Alive Force technology, the fact that there were meetings, the fact that there were these FOIA requests where of course all confidential information was redacted according to FOIA. But if you look at what the ALJ actually said, he said all of that was not especially probative. That's in Appendix 202. Instead, what he relied on was a set of evidence, also in Appendix 202, the next paragraph. I'd like to briefly walk the court through that because we don't believe it constitutes any evidence of copying. It's certainly not substantial evidence. One, the fact that by 2014, Apple had shelved an attempt to put an ECG sensor on the very first Apple Watch. I don't know how that shows up. I'm just saying it's not even a reasonable inference to put all that evidence together and say Apple copied. Not all of these. You have emails that relate to AliveCore's public website. Again, before the cardio band existed. You have a 2016 presentation talking about a different AliveCore product and saying that's a reference for an ECG feasibility study. Cardio band was not released until November 2017. You have earlier, the ALJ relied on as copying evidence, an email exchange from a researcher who had reached out to Apple and asked to donate watches for a study with cardio band. I don't know how that shows copying. And certainly not Apple's FDA submissions for its ECG app in which the agency asks applicants to identify comparable products. And Apple said that cardio band was the most similar product on the market. None of it shows copying. I'll reserve my time. Thank you. Mr. Hughes? Yes, Hughes. Good morning and may it please the court. I would like to begin with where my friend left off. This is with the invalidity on copying and industry praise. The evidence, the commission. May I ask you the same question I asked her? If we affirm the PTAP's finding of invalidity, does the commission agree that we vacate and that you have to dismiss the investigation? Well, we do agree. I mean, in Broadcom, something similar happened. What the court did was they claimed the PTAP found invalid that the court affirmed. It found that it's moot. But that is because the commission found no violation. So with respect to a life course appeal, that part of it becomes moot. With respect to Apple's appeal, that has to be remanded to the commission to vacate the orders. The orders are suspended, so all the commission will do will be to rescind them. So now coming back to evidence of industry praise and copying. The evidence the commission relied on was very strong evidence. With respect to industry praise, we have cardiologists. I mean, AliveCore was the first company to be able to combine this ECG and the PPG in the smartwatch. When AliveCore released this product in 2017, the cardiologist called it a paradigm shift in cardiac care. Another cardiologist called it a giant leap in personalized healthcare. This is praise for the product. A product that didn't exist came into existence because of AliveCore's ingenuity. There's an article in cardiology, a peer-reviewed article in cardiology today, which also praised the KBS. So the evidence that the commission relied on in industry praise was especially strong. Similarly, the evidence the commission relied on for copying is as strong. Now if we step back, this is what the story is. In 2013, Apple tried to do the same thing, tried to implement the ECG on its Apple watches, the Apple Series 1 to 3. Apple wasn't able to do that. So Apple shelved the project. Now we come back to 2018. All of a sudden, Apple has been able to do that on the Apple Series 4 and onwards. Now what happened in between was, the evidence shows, was Apple meeting with AliveCore's engineers, inventors numerous times, and also obtaining its FDA's approval through a FOIA request. So between Apple shelving its project in 2013, and all of a sudden being able to develop a project in 2018, or releasing a product, that is what happened in between. Now the FOIA request could not have yielded any confidential information, could it? No, it couldn't. Now the commission isn't saying the FOIA request was confidential information, but the commission is saying that the FOIA request, in combination with all the meetings that AliveCore, that Apple actually requested from AliveCore's engineers, shows what Apple was trying to do in the interim. Did the commission actually make a finding that the secondary considerations evidence was strong, and whatever they found, do you agree with Apple's counsel that we review for substantial evidence the findings as to the strength of the secondary consideration evidence, but we then do our own weighing de novo? I would agree with that, because obviousness is a question of law, right? Based on underlying facts. So the court would have to review the commission's factual finding for substantial evidence, and as we submit here, the evidence is actually quite strong, such that the weighing, right? Because the fourth ground factor is as important as all the other three, which is what this court has said. But the weighing itself, I'm sorry, the weighing itself is not a factual finding. That's correct. That would be illegal, that would be a legal question. But then we also remind the court that I don't think there's any case where this court has reversed the lower tribunal's finding that the secondary considerations overcame the prima facie case showing. There's actually more than one case. My friend says there's only one case, the translucent. There's also the Apple case, where this court affirmed the lower court's finding that the secondary considerations overcame the showing of prima facie obviousness. And I also direct the court to the Volvo-Panther case. In the Volvo-Panther, this court reversed and the board's decision for specifically because the board did not consider the secondary considerations. And the secondary considerations the court found quite telling was that of copying. So we take that, and also in Volvo-Panther, the board and this court found strong evidence of prima facie showing. But the court still reversed and reminded for the board to consider secondary considerations. All this will show that a strong showing of secondary considerations can overcome a showing of prima facie case of obviousness. So the commission was correct in making that finding. I also want to correct one thing my friend from Apple said. What she said was that the commission found the evidence to be weak, that is not correct. The commission found evidence strong. The only evidence the commission found weak was that of commercial success. And the commission didn't credit commercial success in the commission opinion. Commission relied exclusively on copying, which this court has said can be a strong indication of non-obviousness. And industry praise from Apple itself is what commission relied on to make its finding. Now turning to domestic industry. The commission's finding in domestic industry was lawful and also consistent with the facts in this case. For the commission, so the domestic industry product was Apple's life course KBS, and that is what embodies the patented technology. The commission found the domestic industry under prong C. Under prong C, what the commission looks for was the commission has determined the existence of the article, the commission looks for exploitation in that patented technology. In so doing, the commission found that the upgraded product, these are what they call upgrades or future products to the KBS investments in those also were correctly credited to the KBS itself. Apple's contention is that the commission erred in that regard. But this court precedent supports the commission. Specifical, interdigital, where the court explained the meaning of section 337, explained the meaning of prong C. And what the court said was for prong C analysis, the investment has to be directed to the exploitation of the patent. And in this case, all the investment the commission counted or credited was specifically directed to exploitation of the same patented technology. Apple also contends that there was no nexus finding. The nexus finding in this case is as clear as any case one would find. In this case, the KBS is the embodiment of the claims. There's no daylight between the claims and the KBS. In such instances, the commission always infers the nexus requirement. This isn't a case where the patented technology is a small part of the articles of the domestic industry article. In this case, they are all one and the same. So the commission's finding was lawful and also supported by the fact that the commission relied upon. Can you help me on the substantiality of the investments or the expenditures? It seemed that the commission compared the amount of domestic expenditures to the amount of foreign expenditures and it was just that ratio, which was heavily towards domestic expenditures, that was seemingly per se substantial to the commission. Is that a fair interpretation of what the commission said? And if so, help me understand the logic. Right, what the commission does is, so once the commission has the numbers, the commission then determines whether it's significant or substantial in this instance, whether it's substantial. And what this court said in Lilo is that the commission has to be benchmarking numbers. So the commission always undertakes what is called a contextual analysis to determine whether the domestic expenditure is substantial. And what the commission did here, which commission has done numerous investigations, was to compare the domestic R&D spending by a live pool to its foreign R&D spending. So that is a comparison the commission performed to determine substantiality. But Apple says under that reasoning, if it was a dollar invested in the US and 10 cents invested around the world, the commission would have to say that's substantial and none of us would think that was substantial. Is that a fair criticism? It's not fair, it's not fair. That's just going too far, right? Because the numbers also mean something, right? If the commission looks at the numbers and the numbers don't look substantial, the commission may not even get to trying to determine a contextual analysis. In this case, the number was significant. But that doesn't end the inquiry for the commission. The commission always takes the next step to determine is this number significant or substantial in the context of this industry, of this marketplace? So that is what the commission always does. So the commission always conducts a two-step analysis, takes a look at the numbers, and then determines whether this is significant or substantial. So Apple's analogy is far-fetched. So turning to a life course appeal, I mean, the appeal is alert. I know counsel for a life course mentioned that the commission broadly construed the alert limitation. That is not entirely accurate. All the commission said was alert is not limited to a message. That's all the ALG said. The ALG didn't say that it's open to anything at all. What the ALG specifically stated was the statement has to instruct or direct a user to take an ECG. What happens here with the Apple Watch is the Apple Watches don't direct anyone to take an ECG. They simply direct a user to talk to your doctor. And the commission, the ALG found, and the commission agreed that a statement to talk to your doctor isn't the same as take an ECG, either literally or under the doctrine of equivalent. With respect to the section 101, also a life course brief, a life course mentions that, counsel mentions that about a single electrode, that doesn't exist in the claims. It simply doesn't exist. All the claims are directed broadly to a heart rate sensor. It just has a very high level of generalities how the claims are drafted. The claims in the 499 are very unlike the claims in the 731 or the 941 patent. Those claims specifically recite the arrangement of the PPG to the ECG sensor. They recite the two lead electrode. So those claims the commission found pass master under 101, whereas the 499 patent, the claims are at a very high level of generality. So the commission found those invalid under 101. So if the court doesn't have any questions from you all, sir. Thank you. Thank you very much. Mr. Pack, you have a little under 10 minutes left. Thank you, Your Honor. So Your Honor, Your Honors, I'd like to begin by just noting the claim construction order at Appendix 222. And there, Judge Elliott wrote, as for alert and alerting, the plain and ordinary meeting is similarly broad and includes notify, instruct, indicate, generate, and send notification signals. In fact, one purpose of the disclosed invention is to minimize false alarms, suggesting that an alarm, i.e. an audible tone, may qualify as an alert. So we do contend, Your Honor, that the legal definition given to alert as based on the various embodiments constitute not only non-textual messages, but even audible tones such as alerts. And the reason why that's significant, Your Honor, is because in tennis, what we have is, I also give precedence saying, when you have, when you're looking at the question is what is the intended function of something? Is there an alert mechanism? You can also look at instruction manuals. Because obviously, if you have a noise coming from a device, that alone doesn't signify to the user what to do in the case that you receive an audible alert. Here, it's not just the text message on the device, but we have a website. And I'll note, Your Honor, to C. This is Appendix, I believe it's 13904. And this is the website that we cited, where this is not about a future roadmap. This is about Apple telling users what to do with the Apple Watch and the Cardio app. And here, we have take an ECG with a picture of the app and the Apple Watch. And it says, you can take an ECG at any time. And it goes on to say, when you receive an irregular rhythm notification. So we believe that the combination of the alert showing up on the screen, combined with the instructions that are being taught under tennis, shows that there was literal as well as DOE infringement. And then the page of that order, did you say it's 222? Or did I miss a number? Your Honor, I apologize, 322. 322, thank you. 322, Your Honor, I apologize. So the order is 322, and the website is 13904. You can move on, thank you. Thank you. All right, so now I'd like to turn to some of the things that we heard from Apple's counsel. There is a lot of misinformation that is confidential to Apple. And I won't go into the specifics, but just to note, Appendix 202 is where the ALJ summarizes the voluminous evidence of Apple engaging in a course of conduct over many years. And as counsel for the commission noted, Apple had tried to build an ECG device, and then ultimately shelled that device for many years until LifeCor came to market with the cardio band product that received the significant industry praise that was talked about. And if you look at some of the confidential records from Apple's own files, Appendix 202, this is specifically analyzing the cardio band ECG functionality, using it as a starting point for the design process of Apple's watch product. So this is not simply people within Apple saying, this is a good idea. I mean, you look at the evidence in totality, and this was a starting point on input process, not only for the FDA approval where they use it as a predicate, but from the very beginning, that this was the cardio band product, the domestic industry product, was the genesis of the revamped efforts to design an ECG sensor and software into the Apple watch. We think this is- I realize that there's quite a bit of evidence that might infer some sort of copying. Is there any direct evidence of copying? We believe all this in totality is direct evidence, as well as circumstantial evidence. And obviously, in many cases involving copying, you don't get direct evidence by the copier saying, I copied X, Y, Z. What we have here is- Would you have any evidence that is actually comparing software to software? Or structure to structure? Yes, and that's on Appendix 202, Your Honor. This is the confidential portion. And I'll just read some of the non-confidential aspects. Multiple internal Apple presentations and similar evidence do provide probative evidence of copying. And you can see there is a citation to a March 2016 Apple presentation characterized as, and you can see specifically, mentions of Apple looking at the technology that was integrated into various products from a live quarter. And in 2017, shortly before KBS received FDA clearance, Apple presentation described its method of mitigating problems with the Apple Watch as, and you can see the quote. And so, one thing I want to make clear here, too, is the invention includes both, and I'm not just talking about the 499, now I'm including all three patents. The invention includes not only detecting using PPG, but confirming using an onboard ECG. And so, one thing that you haven't heard from Apple in its briefing or its oral presentation is that they did not copy the ECG functionality. What they say is, we didn't copy Smart Rhythm, which is the PPG functionality. But all of this evidence shows that they were using the AliveCore not as a post-release benchmarking exercise, but as the beginning of their production and design exercise, with respect to the ECG confirmation. And the reasons I talked about before, we're talking a smart watch form factor with limited ability to integrate electrodes into that watch. And the information that's coming out of those leads is then processed through machine learning and other proprietary and invented technologies that AliveCore built to get reliable confirmation of the arrhythmia. So all of this evidence is here, the copying, and I think Apple conceded that with respect to the strength, as well as the fact of copying and industry praise, it's subject to substantial evidence review. And counsel for the commission spoke on behalf of the commission, and the commission here is the fact finder. The ALJ is a judge who receives evidence and makes recommendations in the form of the initial- Do you agree with your friends on the other side that our standard of review of the weighing of that strong secondary evidence against the strong prima facie case is de novo? We do agree with that, Your Honor. So just quickly give me a sense of how, it's a strong prima facie case, how could the secondary considerations, even if it's as strong as you say, how could it really outweigh that? Well, first of all, we believe that for many of the claims in the 731 patent and in the 941 patent, there was no prima facie case shown at all by the ALJ. So for those claims, we're not even reaching this conclusion and that's definitely subject to substantial evidence review and the judge, as well as the commission, found that those claims are not obvious based on the references that were cited. But with respect to the remaining claims, Your Honor, we have, and you can look at the analysis done by the judge with respect to the obviousness. Many of those were, we believe in our opinion, taking references that suggested certain things and deriving an inference. And we had counter-testimony on that point from the expert. We don't believe it was a strong showing of prima facie case. But even if it were, you have the whole purpose of having the fourth factor is to avoid hindsight. And you have all this other evidence that we just talked about where Apple itself failed to do exactly what AliveCore achieved for many years and then resorted to copying and ultimately had confidential internal praise of the products that embodied the patents. All of that, we believe, shows that what Apple is doing here is trying to use hindsight to piece together disparate pieces of evidence to imply that these claims are obvious. And against that backdrop, when you have such compelling evidence of industry praise and copying, as counsel for the commission noted, we think that when Your Honors look at the weighing, we think this is a particularly strong case of not just industry praise in general, but industry praise by Apple as the basis for development of the competing product that infringes. And so those are the reasons why, Your Honor, that we think this is, obviously in your discretion, but we think this is a case where the commission's ruling should be affirmed. Thank you, Your Honor. Thank you. It looks like you ran through most of your time. I'll give you your, my clock says 18. The clock on the opening just had 10 minutes and I thought that is what I had run through. Oh, did it? I think that, okay. Then give her five back. Thank you, Your Honor, and I apologize if that was my error. I recognize we're focused on Apple's appeal issues, so I won't address the 499, but I would urge the court to look at what Appendix 13904 actually says. It is not what a life course counsel said. Turning back to our appeal issues, and just very briefly on the domestic industry, the commission referred to the interdigital opinion at page 1298 of that opinion. This is the court's rehearing opinion from 2013. This court acknowledged that the activities referred to in subparagraph C must also exist with respect to articles protected by the patent. That is a holding that there are two nexus requirements for subparagraph C, a products nexus and a patent nexus. That's exactly what the commission said here at Appendix 12 note 16. I want to correct the idea that the prototype products are upgraded products. They are different products. The cardio band was a watch band with electrodes in it. The prototype products are smart watches with electrodes on the watch, not the band. And finally, I did not hear the commission cite any legal basis for crediting spending on future, not yet existing products to somehow support a domestic industry in a different discontinued product. I'd like to turn to obviousness now. As to the first question, we have agreement that the question of weighing the secondary considerations against the prima facie case is a legal question for this. Haven't we said, though, that copying is a particularly strong secondary consideration, and if we have strong evidence of copying, isn't that enough, even on a de novo review, to outweigh the prima facie case? I don't think the court has said that, Your Honor. The court has said, for example, in the Volvo Penta case, that copying can be strong evidence. There it was remanded to the board for a better explanation of why the court had not relied on the copying evidence there. I think one thing to focus on in Volvo Penta too is that the board had recognized, and this court agreed, that there's a spectrum between comparison, which is not suspect, and copying, which is there the board has specifically found that the copying evidence, that the evidence, excuse me, was more akin to copying than comparison. Here, at most, what we have is comparison. Hypothetically, though, if we have a situation where there may be a strong prima facie case, but a competitor, like Apple, has been trying to do something and couldn't do it, and there's evidence of actual copying of the product, wouldn't that be fairly persuasive evidence that it wasn't obvious if Apple had been trying, or if the company, I don't wanna make it too personal, if the company had been trying to produce the same product and couldn't do it and resorted to looking at its competitor's product, why wouldn't, in that hypothetical, that be really hard to get over, even under a de novo review? So, a couple answers, Your Honor. First of all, this court has said, as a matter of law, that when you have such a strong prima facie case, again, the point is to avoid hindsight, as a LifeCourse counsel agreed. Here, we have nearly everything disclosed in one single reference, the Amen reference, which is this watch from 2004 that had a PPG and ECG sensor and did virtually everything the claims described. There's no risk, or there's substantially less risk of hindsight bias there. You're not, as a LifeCourse characterized it, pulling from disparate pieces of prior art. Nearly everything is there. But regardless, I do wanna make clear for the court that this is not a case in which Apple tried and failed. There's no finding by the commission to that effect, and there's certainly no evidence of that. First of all, it is, I believe, undisputed that Apple started developing its ECG for the watch in 2012. This is at Appendix 30738, among other places. 2012 was well before the Cartier ban, and also before many of the LifeCourse other products. We, I pointed out previously that the ALJ did not, in fact, rely on this supposed evidence of Apple having access to a LifeCourse product or requesting meetings. The ALJ deemed that not especially probative. Yet, the LifeCourse and the commission continue to cite to that evidence. Even if you look at that evidence, it doesn't support the story that they're telling. If you look, for example, at Appendix 40001, to 40004, that is the testimony about Apple, in 2014, deciding it was not going to try to get an ECG sensor onto the very first watch, but that testimony shows that Apple continued the development work throughout. It didn't simply shelve the project entirely. I'd also point the court to Appendix 12026, which is a 2016 roadmap, showing that Apple was still working on the ECG functionality. I also want to make clear, the commission did not rely on supposed praise from Apple in its secondary considerations analysis, and we've explained why that evidence doesn't support that in our reply brief. And the copying, again, I'll just say that the description of the evidence does not match what's in the record. Thank you. Thank you, Your Honor. I think that's it, right? The case is clear. And it is.